UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALEXANDER E. STEWART,<br><br>Plaintiff,<br><br>v.<br><br>RAY MABUS,<br><br>Defendant. | Civil Action No. 15-576(GK) |

## AMENDED MEMORANDUM OPINION

This is a sad case. A distinguished, award-winning doctor who has served the Navy for more than 24 years, whose undergraduate education, medical studies, and advanced medical education were paid for by the United States Government, and who received regular salary increases in exchange for agreeing to remain in the military for a specific number of years, is suing the Government because it miscalculated the years he was required to serve. Because of that miscalculation, which the Government does not deny, the doctor signed agreements to remain with the Navy until 2015. The Government now claims that he must remain on active duty until 2018 -- a difference of three years.

****

Plaintiff Captain Alexander E. Stewart ("Plaintiff" or "Stewart") brings this action against Secretary of the Navy Ray Mabus ("Defendant," "the Government," or "the Navy") seeking

review of certain determinations by the Board for Correction of Naval Records ("the Board") regarding the period of Stewart's obligation to remain on active duty in the Navy in exchange for substantial educational and financial benefits. See generally Compl. [Dkt. No. 1].

In exchange for Special Pay offered to naval physicians, Stewart executed several contracts, which, by their written terms, extended his active duty obligation to the Navy to at least 2015. When the Navy discovered that the service obligation dates specified in the contracts had been miscalculated and failed to account for pre-existing service obligations, it amended its records and the contracts with Stewart to reflect a later service obligation date of 2018. Stewart petitioned the Board to reverse these amendments, and the Board denied Stewart's request. Stewart then appealed the Board's decision to this Court.

This matter is currently before the Court on the Government's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [Dkt. No. 12] and Plaintiff's Cross Motion for Summary Judgment [Dkt. No. 16]. For the reasons that follow, the Government's Motion to Dismiss shall be **denied**, the Government's Motion for Summary Judgment shall be **granted**, and Plaintiff's Cross Motion for Summary Judgment shall be **denied**.

-2-

**I.     BACKGROUND**

  **A. Factual Background[1]**

   *1.   Stewart's Early Career*

Captain Stewart has had a long and distinguished career in the United States Navy. He has served for over twenty-four years in the Navy's Medical Corps as a physician and has received numerous awards for his academic, research, and professional accomplishments. See e.g., AR 117.

Stewart's career with the Navy began in 1987 when he matriculated at the United States Naval Academy ("USNA"). Stewart graduated from the USNA in 1991 and, in exchange for his studies, incurred an obligation to serve in the Navy for five years. 10 U.S.C. § 6959(a); AR 6; Compl. ¶ 8.

From 1991 to 1995, Stewart attended medical school at the Uniformed Services University of Health Sciences ("USUHS"). Because Stewart remained in school, he did not accrue credit toward his initial five-year service obligation while at USUHS. When

---

[1] Because this matter is an appeal from final agency action, see 5 U.S.C. § 704, the Court relies upon the facts in the Administrative Record ("AR") [Dkt. No. 32] before the Board when it reached its decision, 5 U.S.C. § 706. IMS, P.C. v. Alvarez, 129 F.3d 618, 623 (D.C. Cir. 1997) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").

Stewart graduated from USUHS in May of 1995, he incurred an additional seven-year service obligation to the Navy to be served consecutively with his existing five-year obligation. 10 U.S.C. § 2114(c); AR 10; Fontana v. White, 334 F.3d 80, 86 (D.C. Cir. 2003).

Thus, upon receipt of his medical degree in 1995, Stewart had a 12-year service obligation, requiring that he engage in qualifying service in the Navy until at least May of 2007. In other words, May 2007 constituted Stewart's approximate obligated service date ("OSD"), which is the time at which a service member may leave active duty in the Navy without having to complete additional required service or pay back money or other benefits received from the Government. See e.g., 37 U.S.C. § 302(f) ("An officer who does not complete the period for which the payment was made under [relevant subsections] shall be subject to the repayment provisions of section 303a(e) of [title 37].").

From 1995 to 1996, Stewart completed a one-year medical internship, during which time his 12-year service obligation was stayed. 10 U.S.C. § 2114(d). Accordingly, when Stewart completed his medical internship in 1996, his twelve-year obligation

remained, committing him to remain in the Navy -- and extending his OSD -- until at least 2008.[2]

From 1996 to 1999, Stewart served as a flight surgeon, which satisfied three years of his 12-year active duty service obligation. Upon completion of his tour of duty in 1999, Stewart owed nine years of service, and his OSD remained at 2008.

From 1999 to 2004, Stewart completed a medical residency in otolaryngology. This period of further training again stayed his service obligation to the Navy. 10 U.S.C. § 2114(d). Upon completion of the residency in 2004, Stewart still owed nine years of service, and his OSD was moved up to 2013.[3]

---

[2] The sources in the Administrative Record and the Parties' briefs are generally not precise with respect to the exact date of Stewart's OSD. They often state that the OSD falls in a particular month in a particular year or simply state the year of the OSD. Because resolution of this case does not require any more precision than reference to a particular year, the Court follows the Record and the Parties' practice.

[3] Stewart did incur an additional service obligation by entering the residency program; however, Department of Defense regulations allow service members to fulfill obligations generated by medical residencies conducted in military facilities concurrently with obligations incurred by undergraduate studies and medical school. Magnusson Decl. at ¶ 7 [Dkt. No. 12-3] (citing DODI 6000.13 ¶ 6.6.3.1). Accordingly, while Stewart's otolaryngology residency stayed completion of the years of service he owed, it did not extend his OSD.

### 2.   MSP Agreements

In July of 2004, Stewart applied for his first "Multi-Year Special Pay" ("MSP") agreement with the Navy. AR 45-46. MSP agreements provide Navy Medical Corps officers with annual lump-sum payments in addition to their normal pay in exchange for the commitment to remain on active duty in the Navy for a specified period of time. See 37 U.S.C. § 302. Section 302 provides that "[a]n officer may not be paid additional special pay . . . or incentive special pay . . . for any twelve-month period unless the officer first executes a written agreement under which the officer agrees to remain on active duty for a period of not less than one year beginning on the date the officer accepts the award of such special pay." 37 U.S.C. § 302(c)(1).

Stewart's first MSP request was for a two-year MSP agreement effective July 27, 2004 ("the first MSP Agreement"). AR 45. In the formal request that he executed, Stewart stated, "If my application for MSP is approved, I agree to not tender a resignation or request release from active duty that would be affected during this MSP service obligation. This obligation will be for a period of two years beyond any existing active military service obligation for education or training." AR 45 (emphasis in original). As described above, as of July 2004, Stewart was already obligated to remain on

-6-

active duty for at least nine more years in exchange for the extensive education and training he had received. Since Stewart's OSD was set at 2013 before he requested the first MSP agreement, an additional two-year obligation in exchange for Special Pay would have increased his OSD to 2015.

Unfortunately, when Stewart requested the first MSP agreement, the Navy made a significant mistake in calculating his OSD. That error was not discovered until nearly seven years later. When the Navy calculated Stewart's OSD in response to the first MSP request, it neglected to include Stewart's five-year service obligation incurred by his attendance at the USNA. AR 42. Thus, the Navy's OSD calculation worksheet mistakenly set Stewart's pre-MSP OSD at July 2008; two additional years yielded a post-MSP OSD of July 31, 2010. Id.

This error was included in the first MSP agreement itself, which states, "Pursuant to [cited authority], [Stewart's first MSP request] is approved for Otolaryngology, for two years, at $12,000 per year, effective 27 July 2004. [Stewart's] new obligated service date, as computed on enclosure (2) [the OSD calculation worksheet] is July 2010." AR 40.

After having received one annual payment of $12,000 under the first MSP agreement, Stewart decided to request a new MSP

-7-

agreement. In a request dated November 8, 2004, Stewart requested that his first MSP agreement be terminated in favor of a longer, four-year MSP agreement ("the second MSP agreement") with more attractive annual payments of $25,000. In his request, Stewart acknowledged that the "obligation [under the new MSP agreement] shall be for a period of 4 years beyond any existing active military service obligation for education or training." AR 54. Stewart also acknowledged that he would "repay the unearned portion of [the July 2004] MSP contract[.]" Id.

Stewart's second MSP agreement was approved on December 10, 2004. AR 51. The second MSP agreement had a retroactive effective date of October 1, 2004 and served to terminate Stewart's first MSP agreement as of September 30, 2004. Id. In calculating Stewart's new OSD pursuant to the second MSP agreement, the Navy again included its previous error. AR 56. Failing to account for Stewart's five-year USNA obligation, the Navy set Stewart's pre-MSP OSD in July 2008, added two months for the period that the first MSP agreement was in force, and added an additional four years to account for the second MSP agreement. Id.[4] Accordingly,

_____

[4] The typed portion of the calculation table at AR 56 purports to add three months for the period the first MSP agreement was in force; however, the agreement appears to have been in force only from July 27, 2004 to September 30, 2004 (i.e., just over two months). AR 56. That apparent arithmetic error appears to have

-8-

the second MSP agreement reflects a new OSD of "September 2012." AR 51.

On October 20, 2005, Stewart requested a third MSP agreement ("the third MSP agreement") with even more favorable terms than the last: $33,000 per year in lump-sum payments for four years. AR 63. In his request, Stewart stated that he would undertake an additional service obligation "of 4 years beyond any existing active military service obligation for education or training." AR 63. As before, this third MSP agreement would terminate and replace the then-existing second MSP agreement. Id.

On November 9, 2005, Stewart's third MSP agreement request was approved, establishing the third MSP agreement. AR 62. The third MSP agreement had a retroactive effective date of October 1, 2005 and terminated the second MSP agreement effective September 30, 2005. AR 62.

Again, the Navy included its initial failure to account for Stewart's five-year USNA service obligation. It set Stewart's OSD prior to the second MSP agreement at September 30, 2008.[5] AR 69.

---

been corrected by hand and is not reflected in the MSP agreement itself. AR 51, 56.

[5] This OSD already included two months governed by the very first MSP agreement executed in July of 2004.

The Navy then added one year to the OSD for the payment received under the second MSP agreement and four years for the anticipated payments under the newly executed third MSP agreement. Id. This calculation yielded an OSD of September 2013, AR 69, which is reflected in the third and final MSP agreement, AR 62.[6]

### 3.   Rhinology Fellowship

From July 2009 to July 2010, Stewart participated in a graduate medical education ("GME") rhinology fellowship. By participating in the program, Stewart incurred an additional one-year service obligation. This obligation was to be served consecutively with Stewart's obligations incurred by the Navy's

---

[6] The Administrative Record shows that Stewart made efforts to understand the implications of entering into each of the three MSP agreements and posed several clarifying questions to Karen M. Gaston, Assistant Program Director for Navy Medical Special Pays, and Bill Marin, Director of Navy Medical Special Pays. AR 84-96. Several e-mails suggest Stewart's desire to not incur any service obligations that would require him to stay in the Navy beyond 2015, see AR 88, 94, 103, and on at least one occasion, Stewart noted that he "went to the Naval Academy and then to the Uniformed Services University[,]" AR 103. Although on several occasions, Ms. Gaston and Mr. Marin confirmed the incorrect OSDs reflected in the MSP agreements, "no one person or officer within the Navy Medicine [was] responsible for ensuring the accuracy of DOW physicians' overall OSD. . . ." AR 89, 92, 101.

None of Stewart's e-mails caused the Navy to recognize its mistake. However, there is no evidence in the Administrative Record that Stewart kept his own tally of the obligations he incurred nor that he ever challenged the Navy's calculation of his OSD before entering into any of the three MSP agreements.

sponsorship of his undergraduate and medical education, AR 77-78, but could be served concurrently with obligations incurred through MSP agreements, AR 86.

In order to formalize Stewart's participation in the rhinology fellowship, the Navy prepared a GME agreement, which stated that upon completion of his fellowship, Stewart would owe a five-year obligation to the Navy. AR 78 ("When I complete this GME, my total [active duty service obligation] will be: 5 years"). Ironically, the worksheet used to calculate this obligation actually includes Stewart's five-year obligation incurred by his attendance at the USNA, but omits any reference to service obligations incurred through Stewart's multiple MSP agreements. AR 75.

The worksheet notes that as of July 2004, Stewart still had an obligation to serve nine additional years to account for his remaining USNA and USUHS obligations. Id. It accounts for five years of creditable service performed between July 2004 and July 2009. Id. The worksheet then notes the stay of Stewart's obligations during the fellowship, and adds a year of additional service for the fellowship, arriving at an OSD of July 2015. Id. This OSD could not have been correct given the lack of any reference to obligations incurred under the MSP agreements.

The Government asserts that the GME agreement worksheet was not meant to account for MSP obligations and that "anyone familiar with the acronyms MSP and MISP [Multi-year Incentive Special Pay] should have known that these obligations were not included in the OSD calculation of 2015." Gov't's Reply at 3.

### 4.  Recapitulation

For the sake of clarity, the Court will sum up what would have happened if Stewart had made each of the same three MSP requests and the Navy had correctly calculated his OSD in each MSP agreement. As of July 2004, Stewart still owed nine years of service in exchange for his education at the USNA and USUHS, and thus, had an OSD of July 2013. He entered a two-year MSP agreement (the first MSP agreement), which would have moved his OSD to July 2015. However, that first MSP agreement was terminated after just two months in favor of a four-year MSP agreement (the second MSP agreement). Under the second MSP agreement, Stewart's OSD would have been September 2017 (a date which takes account of the two months under the first MSP agreement and four years under the second). Finally, after just a year under the second agreement, Stewart signed a third MSP agreement, terminating the second MSP agreement. Thus, Stewart's OSD should have been adjusted again to September 2018 (beginning at July 2013, adding two months for the

-12-

first MSP agreement, one year for the second MSP agreement, and four years for the third and final MSP agreement).

The one-year obligation incurred as a result of Stewart's rhinology fellowship could be served concurrently with any obligation incurred under an MSP agreement. Because any MSP agreement necessarily increased Stewart's OSD by at least a year, 37 U.S.C. § 302(c)(1), participation in the fellowship program would not have affected Stewart's OSD.

If the Navy had never made its initial error, and Stewart had entered into MSP agreements of the same duration, his OSD clearly would be in <u>September of 2018</u>, not September of 2013 as the third MSP agreement states, AR 62, nor July 2015 as the GME worksheet states, AR 75.

### 5.   *Error Correction Letters*

In 2010, the Chief of Naval Personnel became concerned that many contracts with Navy medical officers contained incorrectly calculated OSDs and requested that the Naval Audit Service perform a review. <u>See</u> Pl.'s Ex. 1 [Dkt. No. 16-2]. The auditors identified eight Navy physicians affected by OSD computation errors, including Stewart. Pl.'s Ex. 1; Compl. ¶ 29.

On February 9, 2011, the Navy notified Stewart that it had discovered that his MSP contracts failed to account for his five-

year USNA service obligation. AR 80. The letter notes the inaccurate pre-MSP OSD of July 2008, id., which had been the baseline for the calculation of Stewart's OSD in his very first MSP agreement, AR 42, and states that his OSD had been adjusted to August 2013, AR 80. The letter goes on to warn that "[a]s a result of this OSD adjustment, it is possible any Multiyear Special Pay (MSP) agreement you entered into may be affected." Id.

A second letter arrived two days later on February 11, 2011. That letter again noted the original OSD calculation error, and correctly identified its source as Stewart's "initial MSP agreement executed July 27, 2004." AR 82. In order to correct the error, the Navy stated that it would amend the OSD contained in Stewart's third and final MSP agreement from September 2013 to October 2018. AR 82.[7]

---

[7] Given that the third MSP agreement lists an OSD of "September 2013," AR 62, and the Navy's correction letters of February 9 and 11, 2011 purport to add Stewart's five-year USNA service obligation to his OSD, AR 80 & 82, it is not immediately clear why Stewart's amended OSD should be October 2018 rather than September 2018. However, the worksheet appended to the third MSP agreement shows an OSD of "2013/09/30," AR 69, so any difference may just be a matter of a single day. Moreover, the Parties' briefs and the Administrative Record do not consistently track shifts in Stewart's OSD by days. Instead, they generally measure changes to his OSD in months or even just years. Finally, Plaintiff has not raised this issue, so the Court will treat the difference between a September 2018 and an October 2018 OSD as de minimis and will not address it further.

Both letters advised Stewart that he could "submit a request to the Board for Correction of Naval Records (BCNR) to dispute [the] decision." AR 82; accord AR 80.

### B. Procedural Background

Nearly three years later, on January 12, 2014, Stewart did petition the Board to overturn the amendments referred to in the two letters of February 9 and 11, 2011. Compl. ¶ 36. Specifically, he requested that the Navy reinstate his pre-MSP OSD as July 2008 and recognize as binding the OSD of July 27, 2015 reflected in the worksheet accompanying the GME agreement Stewart executed before beginning his rhinology fellowship. AR 18-19.

On July 16, 2014, in response to Stewart's petition, the Board requested an advisory opinion from the Navy Medicine Professional Development Center, AR 27, and on September 15, 2014, the Navy's Bureau of Medicine and Surgery responded, recommending disapproval of Stewart's petition, AR 24. On November 7, 2014, the Board denied Stewart's petition. AR 3-4.

On April 16, 2015, Stewart filed his Complaint [Dkt. No. 1] challenging the Board's denial of his petition. The Complaint asserts three causes of action, all under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706(2)(A). Compl. ¶¶ 40-79.

Stewart's first claim alleges that it was contrary to law for the Navy to amend |his OSD to a date different from the date contained in his third and final MSP agreement. Compl. ¶¶ 40-53. Stewart's second claim alleges that it was contrary to law for the Navy to amend Stewart's OSD to a date different from the date contained in the GME agreement executed before he began his rhinology fellowship. Compl. ¶¶ 54-67. Finally, Stewart's third claim alleges that the Navy's amendments of Stewart's OSD were arbitrary, capricious, and an abuse of discretion. Compl. ¶¶ 68-79.

On August 3, 2015, the Government filed its Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [Dkt. No. 12]. On August 31, 2015, Plaintiff filed his combined Memorandum in Opposition and Cross Motion for Summary Judgment [Dkt. No. 16]. On October 13, 2015, the Government filed its combined Reply to Plaintiff's Opposition and Memorandum in Opposition to Plaintiff's Cross Motion for Summary Judgment [Dkt. No. 23]. On November 3, 2015, Plaintiff filed his Reply to the Government's Opposition [Dkt. No. 26].[8]

---

[8] Plaintiff also filed a Motion for Leave to File a Surreply in Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Pl.'s Mot. for Leave") [Dkt. No. 27]. On November 19, 2016, the Government filed its Opposition to Plaintiff's Motion for Leave [Dkt. No. 28]. The Court denied

## II.   STANDARD OF REVIEW

### A.   Motion to Dismiss for Lack of Jurisdiction

Under Fed. R. Civ. P. 12(b)(1), "[t]he plaintiff bears the burden of invoking the court's subject matter jurisdiction" to hear his or her claims. Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015). In deciding whether to grant a motion to dismiss for lack of jurisdiction, the Court must "accept all of the factual allegations in [the] [C]omplaint as true[.]" Jerome Stevens Pharm., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005) (quoting United States v. Gaubert, 499 U.S. 315, 327 (1991)) (internal quotation marks omitted). However, "[w]here necessary to resolve a jurisdictional challenge under Rule 12(b)(1), the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (internal citation and quotation marks omitted).

### B.   Summary Judgment

Summary judgment may be granted only if the moving party has shown that there is no genuine dispute of material fact and that

---

Plaintiff's Motion for Leave on February 2, 2016. Memorandum Order of Feb. 2, 2016 [Dkt. No. 35].

the moving party is entitled to judgment as a matter of law. See
Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 325
(1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C.
Cir. 2002).

Plaintiff's challenge arises under the APA, 5 U.S.C.
§ 706(a)(2), which provides that reviewing courts "shall . . .
hold unlawful and set aside agency action, findings, and
conclusions found to be . . . arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law[.]" Courts in
this Circuit routinely apply the APA's standards to the Board's
decisions. See Piersall v. Winter, 435 F.3d 319, 321 (D.C. Cir.
2006) ("These are not uncharted waters. We have many times reviewed
the decisions of boards for correction of military records in light
of familiar principles of administrative law." (internal quotation
marks omitted)).

When a district court reviews an administrative action,
"[t]he entire case on review is a question of law." Am. Bioscience,
Inc. v. Thompson, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001) (internal
quotation marks omitted). "Summary judgment thus serves as the
mechanism for deciding, as a matter of law, whether the agency
action is supported by the administrative record and otherwise
consistent with the APA standard of review." Sierra Club v.

Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing Richards v.
INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). Finally, the
Court's review on summary judgment is limited to the Administrative
Record. Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d
156, 160 (D.C. Cir. 2003) (citing Camp v. Pitts, 411 U.S. 138, 142
(1973)); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C.
1995) amended, 967 F. Supp. 6 (D.D.C. 1997) ("Summary judgment is
an appropriate procedure for resolving a challenge to a federal
agency's administrative decision when review is based upon the
administrative record.").

## III. ANALYSIS

### A.   Jurisdiction

"Federal courts have limited jurisdiction and may not presume
the existence of jurisdiction in order to decide a case on other
grounds." Morrison v. Sec'y of Def., 760 F. Supp. 2d 15, 17 (D.D.C.
2011) (citing Tuck v. Pan Am. Health Org., 668 F.2d 547, 549 (D.C.
Cir. 1981)). On its face, Plaintiff's Complaint seeks review of
the Board's failure to correct his OSD to follow his third MSP and
GME agreements as originally written, see Compl. ¶¶ 53, 67, 79,
rather than to enforce those agreements directly. Although this
distinction is subtle, it is critical to this Court's jurisdiction.

Sovereign immunity ordinarily protects the federal government from suit without its consent. See Trans-Bay Engineers & Builders, Inc. v. Hills, 551 F.2d 370, 376 (D.C. Cir. 1976). In this case, Plaintiff invokes § 702 of the APA, which partially waives sovereign immunity for "action[s] . . . seeking relief other than money damages[.]" 5 U.S.C. § 702.

As already noted, judicial review of the Board's determinations under the APA is well established. Piersall, 435 F.3d at 321. However, our Court of Appeals has also held that "the waiver of sovereign immunity in the Administrative Procedure Act does not run to actions seeking declaratory relief or specific performance in contract cases[.]" Sharp v. Weinberger, 798 F.2d 1521, 1523 (D.C. Cir. 1986). The holding in Sharp rests on two bases. First, "[the APA's] waiver [of sovereign immunity] is by its terms inapplicable if 'any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought[.]'" Id. (quoting 5 U.S.C. § 702). Second, "the Tucker Act and Little Tucker Act" provide the exclusive remedies for any alleged breach of contract by the federal government and thereby "impliedly forbid" the federal courts' jurisdiction to grant declaratory relief or specific performance in contract cases. Id.

The Government contends that Plaintiff's case is effectively one for breach of contract because he seeks to enforce the original terms of his MSP and GME agreements. However, in construing Sharp, our Court of Appeals has stated "that a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract--that is, specific performance. The Sharp Court ruled that § 702 waived sovereign immunity for [the plaintiff's] prayer for an injunction against his transfer, an order, in other words, compelling the Defense Department to abide by the terms of its agreement with [the plaintiff]." Transohio Sav. Bank v. Dir., Office of Thrift Supervision, 967 F.2d 598, 610 (D.C. Cir. 1992).

Plaintiff's Complaint follows the outline described in Transohio. Stewart is not bringing a free-standing breach of contract claim. Instead, he challenges the Board's failure to correct the Navy's unilateral amendment of the OSD reflected in his MSP and GME agreements. If Plaintiff were to prevail, the Navy might be required to abide by the terms of the agreements as written, but even so, that result would not transform Plaintiff's case from one seeking administrative review into a breach of contract claim. Id., 967 F.2d at 610-11 ("The mere fact that a

-21-

court may have to rule on a contract issue . . . does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract and deprive the court of jurisdiction it might otherwise have." (internal brackets, citation, and quotation marks omitted)); see also Spectrum Leasing Corp. v. United States, 764 F.2d 891, 893 (D.C. Cir. 1985) ("A court will not find that a particular claim is one contractually based merely because resolution of that claim requires some reference to a contract." (emphasis in original)).

Accordingly, the Court holds that it has jurisdiction to hear Plaintiff's claims and shall deny the Government's Motion to Dismiss for lack of jurisdiction.

**B.    Merits**

As described above, Stewart entered into a series of agreements with the Navy entitling him to Special Pay in exchange for promises to extend his term of active duty service. Those agreements contained specific dates indicating when he would be permitted to resign from naval service. By its own admission, the Navy miscalculated the dates contained in its agreements with Stewart, and upon discovery of its error, took steps to unilaterally alter Stewart's OSD. Stewart argues that his OSD should be reset to conform to the written terms of his agreements

-22-

with the Navy because the Navy's unilateral amendments are arbitrary, capricious, and contrary to law.

Plaintiff contends that the Court should employ the common law of contracts to hold that the Navy's amendments to his OSD and MSP agreements were contrary to law. The relief he seeks amounts to reinstatement of the MSP and GME agreements[9] as initially drafted. See Compl. pp. 17-18 (requesting, inter alia, that the Court "[e]nforce the parties' November 9, 2005 [third] MSP Agreement; [d]eclare [] Stewart's MSP OSD is November 1, 2015; . . . [p]ermanently enjoin the [Navy] . . . from enforcing, applying, or implementing . . . any obligation dates other than July 1, 2015 (GME) and November 1, 2015 (MSP)"). Thus, Plaintiff seeks to retain the Special Pay and benefits he received from the admittedly inaccurate OSD reflected in his final MSP agreement and GME agreement.

The Supreme Court has held that "[a] soldier's entitlement to pay is dependent upon statutory right." See Bell v. United States, 366 U.S. 393, 401 (1961). "The rights of . . . service members must be determined by reference to the statutes and regulations

---

[9] The Navy's letters of February 9 and 11, 2011 do not purport to amend Stewart's GME agreement. AR 6, 7. Rather, they amend his OSD itself, and the OSD as listed in his third and final MSP agreement. Id.

governing the [particular benefit], rather than to ordinary contract principles." United States v. Larionoff, 431 U.S. 864, 869 (1997); see also Combs v. U.S., 50 Fed. Cl. 592, 605 (Fed. Cl. 2001) (rejecting plaintiff's argument that he should be paid at E-6 pay rate when Air Force forms so indicated because statute made clear that plaintiff was entitled to only E-1 pay rate).

Plaintiff contends that the Court can resolve this dispute with reference only to ordinary contract law because "[t]o determine whether the military has breached an enlistment contract or whether an enlistment contract is invalid, courts apply general, common law principles of contract law." Qualls v. Rumsfeld, 357 F. Supp. 2d 274, 279-80 (D.D.C. 2005). It is true that "[m]any cases hold that civilian courts may apply traditional contract principles in construing the rights and obligations arising under enlistment contracts and, by analogy, active duty agreements." Cinciarelli v. Carter, 662 F.2d 73, 78 (D.C. Cir. 1981). However, Qualls acknowledges that cases "concern[ing] soldiers' entitlement to pay" must be resolved according to statutory and regulatory provisions, rather than ordinary contract law. Qualls, 357 F. Supp. 2d at 280 n.1.

This case unquestionably contains elements of pay entitlements and service obligations; however, the relief

-24-

Plaintiff requests depends upon the validity of his MSP and GME agreements, and the validity of those agreements, in turn, depends upon the statutory and regulatory provisions authorizing Special Pay. Cf. United States v. Larionoff, 431 U.S. 864, 869 (1997) (holding that plaintiffs' entitlement to "Variable Re-enlistment Bonus" payments "must be determined by reference to the statutes and regulations governing the [Bonuses], rather than to ordinary contract principles."). Thus, before the Court may consider whether to enforce Stewart's agreements as written, it must first consider whether the agreements comport with the statutes and regulations that authorize their creation. Therefore, Plaintiff's entitlement to the Special Pay he received and the validity of the agreements he executed is governed by the statutory and regulatory provisions underlying Special Pay agreements.

Section 302(c)(1) permits the payment of Special Pay or Incentive Special Pay only when an "officer first executes a written agreement in which the officer agrees to remain on active duty for a period of not less than one year beginning on the date the officer accepts the award of such special pay." 37 U.S.C. § 302(c)(1).

Navy regulations further clarify that "[t]he active duty service obligation for [Multi-year Special Pay and Multi-year

-25-

Incentive Special Pay] begins after any preexisting obligation for medical education and training or previous MSP agreement is served." OPNAVINST 7220.17 at 250(2)(a).[10] The same regulation at 251(1) requires the medical officer applying for Special Pay to "execute[] a written agreement to remain on active duty for 2, 3, or 4 years beyond any existing active duty service obligation for medical education and training or a previous MSP agreement." Id. at 251(1). Plaintiff acknowledges that these regulations are binding. Pl.'s Reply at 2 ("USNA and USUHS obligations are required to be served prior to any MSP obligations. See OPNAVINST 7220.17") (emphasis added).

As initially drafted, the third and final MSP agreement would have obligated Stewart to remain on active duty until only September 2013, despite the fact that he was already obligated to remain on active duty until his UNSA and USUHS obligations were met in July 2013. Thus, it is clear that the MSP agreement conflicts with the requirements that officers receiving Special Pay must agree to remain on active duty service for at least one year, 37 U.S.C. § 302(c)(1), and that active duty obligations incurred through MSP agreements must follow the completion of

---

[10] Available at
http://www.med.navy.mil/bumed/Special_Pay/Documents/HomeLinks/References/OPNAVINST%207220.17.pdf (last visited Feb. 12, 2016).

pre-existing service commitments,   OPNAVINST 7220.17 250(2)(a).
Given that Stewart's written agreements with the Navy would permit
him to keep five years' worth of Special Pay distributions and
leave military duty before completing five years of service beyond
his pre-existing obligations, those agreements are invalid. See
Larionoff, 431 U.S. at 869.

If enforced as written, Plaintiff's third and final MSP
agreement would violate the statutory and regulatory provisions
that authorize the creation of MSP agreements. By refusing to take
action that would violate those provisions, the Navy is obviously
not acting arbitrarily, capriciously, or contrary to law.

Next, the Court cannot enforce Stewart's GME agreement.
Plaintiff asks the Court to "[e]nforce the parties' December 12,
2008 GME agreement" and to "[d]eclare [that] Stewart's GME OSD is
July 1, 2015[.]" Compl. p. 17. As an initial matter, Plaintiff's
GME agreement does not even contain the date July 1, 2015; that
date is contained only in the worksheet used to prepare the
agreement itself. AR 75. The agreement simply states "[w]hen I
complete this GME, my total ADO [active duty obligation] will be:
5 years[.]" AR 78. It is far from clear whether the "total ADO"
referred to in the GME agreement is intended to include active
duty obligations incurred through MSP agreements or whether it is

-27-

meant only to reflect the "total ADO" incurred through education and training.

More importantly, however, enforcement of a July 1, 2015 OSD would also conflict with 37 U.S.C. § 302(c) and OPNAVINST 7220.17 at 250(2)(a) because Plaintiff would retain five years' worth of Special Pay distributions without providing the required five additional years of active duty service beyond July 2013. Again, the Navy's effort to comply with the applicable statute and regulation cannot be deemed arbitrary, capricious or contrary to law.

In short, Stewart's GME and MSP agreements, as initially drafted, violated 37 U.S.C. § 302(c)(1) and OPNAVINST 7220.17 250(2)(a), and therefore could not be enforced as Plaintiff argues.

Finally, the practical reality is that Stewart wants to terminate his service with the Navy - which paid for his undergraduate education, medical school, internship, medical residency in the specialty of otolaryngology, and Special Pay of annual lump-sum payments on top of his regular pay - without having to pay for his end of the bargain - namely, provision of high quality, specialized medical care to the Navy for the period of time he agreed to. In sum, he would be unjustly enriched. As the

Court said in <u>Fontina v. White</u>, 334 F.3d 80, 87 (D.C. Cir. 2003),

ruling in a similar situation,

> Such a windfall would be inconsistent with one of the
> Army's primary purposes, as stated in the regulations,
> for requiring such obligations in exchange for
> educational assistance: ensuring "a reasonable return to
> the Army following the expenditure of public funds." AR
> 350-100, at P7(a)(4); <u>cf.</u> <u>Schaefer v. Cheney</u>, 725 F.
> Supp. 40 49, (D.D.C. 1989) (stating that "one of the
> fundamental purposes of requiring" service obligations
> is to provide the Army with "a fair <u>quid</u> <u>pro</u> <u>quo</u> for
> [its] investment in personnel").

**IV.   CONCLUSION**

For the forgoing reasons, the Government's Motion to Dismiss

shall be **denied,** the Government's Motion for Summary Judgment shall

be **granted,** and Plaintiff's Cross Motion for Summary Judgment shall

be **denied.**

February 24, 2016

Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF